Keith M. Aurzada (SBN 24009880)
Michael P. Cooley (SBN 24034388)
Bradley J. Purcell (SBN 24063965)
Lindsey L. Robin (SBN 24091422)
**REED SMITH LLP**
2850 N. Harwood Street, Suite 1500
Dallas, TX 75201
T: 469.680.4200
F: 469.680.4299

*Counsel for the Thompson Street Defendants*

## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 16-32856-hdh-7 |
| | § | Case No. 16-32859-hdh-7 |
| Stone Panels, Inc., and | § | |
| Stone Panels Holding Corp., | § | Jointly Administered Under |
| | § | Case No. 16-32856-hdh-7 |
| Debtors | § | Chapter 7 |
| | § | |
| Robert Yaquinto, Chapter 7 Trustee, | § | |
| | § | |
| | § | |
| (Substituting as) Plaintiff, | § | |
| | § | |
| vs. | § | Adv. Proc. No. 16-03143-hdh |
| | § | |
| The PrivateBank and Trust Company, et al., | § | |
| | § | |
| | § | |
| Defendants. | § | |

## BRIEF IN SUPPORT OF OBJECTION TO AND MOTION TO STRIKE
## DESIGNATION OF EXPERT WITNESS CHRISTOPHER QUINN

# TABLE OF CONTENTS

**Page**

I. PRELIMINARY STATEMENT ........................................................................................ 1

II. JURISDICTION ........................................................................................................... 2

III. FACTS ......................................................................................................................... 2

   A. The Transactions ..................................................................................................... 3

   B. The Initial Report .................................................................................................... 5

   C. The Supplemental Report ........................................................................................ 6

IV. Relief Requested ......................................................................................................... 7

V. Legal Standard ............................................................................................................. 7

VI. Arguments and Authorities ......................................................................................... 9

   A. Quinn's Adequate Capital Test and Cash Flow Test are Unreliable because They are based on Quinn's Ipse Dixit and Ignore the Actual Data ............................................. 9

     i. Quinn's Financial Projections are Unsupported Conjecture .............................. 11

     ii. Quinn's Justifications for his Projections are Impermissible Hindsight ........................... 12

     iii. . Quinn's Supplemental Report uses Hindsight Bias to Justify his Projections, but Fails to Cure the Fatal Defects in the Initial Report ......................................................... 15

   B. Quinn's Adequate Capital Test and Cash Flow Test are Unreliable because They are based on Unreliable Methodologies ......................................................................... 17

     i. Quinn Cherry Picks a Five Year Timeline and Assumes that Stone Panels cannot refinance its Debt ................................................................................................. 17

     ii. Quinn Admits that he Erred in his Original Calculations of Adequate Capital and Cash Flow and that he Erred again in his Supplemental Calculations .......................................... 19

     iii. Quinn Justifies his Conclusions based on the Irrelevant Altman Z Score ...................... 21

   C. Quinn's Balance Sheet Opinion is Unsupported and Unreliable ...................................... 23

PRAYER ............................................................................................................................ 25

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993).................................................................................................2, 7, 8

*Duke Salisbury v. Tex. Commerce Bank, N.A.*,
   171 B.R. 985 ........................................................................................................16

*Duke Salisbury v. Tex. Commerce Bank, N.A. (In re WCC Holding Corp.)*,
   171 B.R. 972 (Bankr. N.D. Tex. 1994)...............................................................9, 10

*Kumho Tire Company, Ltd. v. Carmichael*,
   526 U.S. 137 (1999)...................................................................................................7

*Moore v. Ashland Chemical, Inc.*,
   151 F.3d 269 (5th Cir. 1998) (en banc) ...................................................................8

*State Auto. Mut. Ins. Co. v. Freehold Mgmt.*,
   Civil Action No. 3:16-CV-2255-L, 2019 U.S. Dist. LEXIS 55052 (N.D. Tex.
   2019) ........................................................................................................................8

*Unrein v. Timesavers, Inc.*,
   394 F.3d 1008 (8th Cir. 2005) .................................................................................8

*Wells Fargo Bank N.A. v. Tex. Grand. Prairie Hotel Realty, L.L.C. (In re Tex.
   Grand Prairie Hotel Realty, L.L.C.)*, 710 F.3d 324, 329 (5th Cir. 2013)................8

*Williams v. Wu (In re TTC Plaza Ltd. P'ship)*,
   Nos. 11-38381, 13-03261, 2014 Bankr. LEXIS 1359 (Bankr. S.D. Tex. 2014)...........9, 16, 24

**Rules**

Fed. R. Evid. 702 ...........................................................................................................7

**Other Authorities**

*Beyond Moody: a Re-Examination of Unreasonably Small Capital,* Hastings Law
   Journal Volume 57 Issue 4, Article 5.....................................................................17

https://restructuring.weil.com/avoidance-actions/unreasonably-small-capital/............................17

## OBJECTION TO AND MOTION TO STRIKE
## <u>DESIGNATION OF EXPERT WITNESS CHRISTOPHER QUINN</u>

Defendants Thompson Street Capital Partners, Thompson Street Capital Partners L.L.C., and Thompson Street Capital Partners III, L.P. (collectively, the "**Thompson Street Defendants**" or "**Thompson Street**") file this *Objection to and Motion to Strike Designation of Expert Witness Christopher Quinn* (the "**Motion to Strike**") and, in support thereof, would respectfully show the Court as follows:

### I.        <u>PRELIMINARY STATEMENT</u>

1.        In this case, the Trustee's[1] fundamental charge is that Thompson Street's acquisition of Stone Panels left both Debtors insolvent, undercapitalized, or otherwise unable to continue as a going concern. In connection with those assertions, the Trustee designated Christopher Quinn ("**Quinn**") as a testifying expert on Stone Panels' solvency. Quinn's expert report and testimony, however, are fatally flawed because they are fundamentally unreliable.

2.        Most critically, Quinn must be disqualified from providing testimony in this case because his opinions are entirely based on data he created that is unsupportable. Under Quinn's analysis, when Thompson Street acquired Stone Panels it should have *reasonably* anticipated that the company would have 0% growth for five years and at the end of five years, it would not have been able to refinance its long term debt. Quinn's assumption that Stone Panels would have zero growth for five consecutive years is unsupported by any data. It ignores Stone Panels' **<u>actual</u>** historical growth. It ignores **<u>all</u>** data actually relied upon by Thompson Street and **<u>all</u>** data reasonably available to Thompson Street at the time of the transactions. It relies **<u>only</u>** on his unsupported conclusions and hindsight bias.

---

[1] In this Motion, "the Trustee" shall mean Robert Yaquinto in his capacity as the Chapter 7 Trustee for Stone Panels, Inc. and Stone Panels Holding Corp. (together, the "**Debtors**").

3.      Indeed, Quinn admits that his projection of 0% growth was:

- Not based on any market research;
- Not based on any projections from Stone Panels;
- Not based on projections from any third-party;
- Not based on any communications from Stone Panels; and
- Not based on interviews with Stone Panels employees.

His projections are based entirely on his *ipse dixit*.

4.      The Trustee's designation and disclosure of Quinn as an expert in this adversary proceeding should be stricken pursuant to *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and Rule 702 of the Federal Rules of Evidence. The Quinn Report is unreliable because it is not based on reliable data and does not use reliable methodologies. Rather than using readily available data, conducting independent research, or using market data, Quinn invents his own data to match the Trustee's expected outcome and applies the invented data with unreliable methods. Accordingly, the designation and disclosure of Quinn as an expert in this adversary proceeding should be stricken.

## II.      <u>JURISDICTION</u>

5.      This Court has subject-matter jurisdiction and adjudicatory authority to hear and determine this Motion under Rule 702 of the Federal Rules of Evidence.

## III.      <u>FACTS</u>

6.      Quinn's "expert reports" relate to Thompson Street's acquisition of Stone Panels, Inc. ("**Stone Panels**") in July 2014.

### A. The Transactions

7. On July 31, 2014, the shareholders of Stone Panels entered into a Stock Purchase Agreement[2] under which the majority[3] of the shares of Stone Panels were sold to Stone Panels Holding Corporation ("**Holding**") a special purpose entity formed by Thompson Street for the purpose of owning Stone Panels. The purchase price was $34,000,000 (the "**July Transaction**").[4]

8. The purchase price, costs of closing, and related expenses were funded with a $20,300,000 capital contribution from Thompson Street to Holdings and an 8% Convertible Promissory Note in the amount of $16,000,000 payable to Thompson Street by Holdings (the "**Thompson Street Note**").[5] The Thompson Street Note bore interest at the rate of 8% per annum, and the maturity date was July 31, 2015.[6] The Thompson Street Note authorized the Thompson Street Defendants to convert the outstanding principal into stock for Holding.[7]

9. On September 19, 2014, The PrivateBank and Trust Company ("**PrivateBank**") and Brookside provided financing and refinanced the Thompson Street Note (the "**September Transaction**" and together with the July Transaction, the "**Transactions**").[8] As part of the September Transaction, PrivateBank and/or Brookside Mezzanine Fund III, LP ("**Brookside**") made a payment of $14,427,777.73 to Thompson Street (the "**September Payment**"), which

---

[2] *See* Declaration of Elizabeth Borow in Support of Motion, attached hereto as **Exhibit 1** (App._00001); Stock Purchase Agreement, attached hereto as **Exhibit 2** (App._000002). Citations to the Appendix Supporting the Motion are "App._xxxxxx".

[3] Holding received all of Stone Panels' outstanding capital stock except for those shares owned by Timothy Friedel, Stone Panels' CEO, and Thomas Taylor, Stone Panels' vice president of operations. Friedel and Taylor exchanged their shares of Stone Panels for shares of Holding.

[4] Stock Purchase Agreement ¶ 1.2 (App._000004).

[5] Funds Flow (TCSP0005174) , attached hereto as **Exhibit 3** (App._000070)**.**

[6] Stone Panels Holding Corporation 8% Convertible Promissory Note, attached hereto as **Exhibit 4** (App._000085)**.**

[7] *Id.* (App._000093).

[8] *See* PrivateBank Note and Brookside Note, attached hereto as **Exhibit 5** (App._000104)**.**

extinguished the Thompson Street Note.[9] The remaining $2,000,000 in principal was exchanged for additional stock in Holdings.[10]

10.　　　　On or about August 27, 2015, Transcend Valuation, LLC ("**Transcend**") delivered its ASC 805 Analysis (the "**Transcend Report**") of the value of Stone Panels as of July 31, 2014.[11] The standard of value employed in the Transcend Report was "fair value," which is defined by FASB ASC 820 to mean "[t]he price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date."[12] The premise of value employed in the Transcend Report was a "going concern value," which is "[t]he value of a business enterprise that is expected to continue to operate into the future" as distinguished from an orderly or forced liquidation value.

11.　　　　Based on these and other standards set out in the Transcend Report, Transcend assessed the fair value of Stone Panels as of July 31, 2014 to be $36,092,206, including $19,568,676 in Unidentified Intangible Value." [13]

12.　　　　On November 9, 2015, KPMG, LLP provided an Independent Auditor's Report for the consolidated financial statements of Stone Panels and Holdings as of June 30, 2015 (the "**Audited Financials**").[14] According to KPMG, the Audited Financials "present fairly, in all material respects, the financial position of Stone Panels Holding Corporation and subsidiaries as of June 30, 2015, and the results of their operations and their cash flows for the period from July 31, 2014 (commencement of operations) through June 30, 2015, in accordance with U.S. generally

---

[9] Refinancing Funds Flow, attached hereto as **Exhibit 6** (App._000114)**.**

[10] *Id.*

[11] *See* ASC 805 Analysis of Stone Panels, Inc., attached hereto as **Exhibit 7** (App._000120)**.**

[12] *Id.*

[13] *Id*. p. 27 (App._000147).

[14] Stone Panels Holdings Corporation and Subsidiaries Consolidated Financial Statements June 30, 2015, attached hereto as **Exhibit 8** (App._000192)**.**

accepted accounting principles." The Audited Financials provide that as of June 30, 2015, Holdings and Stone Panels had a total equity of $19,507,687.[15]

### B.    The Initial Report

13.    On or about January 22, 2021, Quinn issued his expert report (the "**Initial Report**").[16] In the Initial Report, Quinn states that he reviewed and analyzed the financial condition of Stone Panels and Holdings (which he jointly refers to as, the "**Company**") "during the period from January 2013 through April 2016 to determine whether the Company was rendered insolvent and/or inadequately capitalized or undercapitalized as a result of [Thompson Street's] acquisition of [Stone Panels] on July 31, 2014 and/or the refinancing of the Thompson Street Note on September 19, 2014."

14.    Quinn states that "[i]n bankruptcy and corporate law, there are three well recognized solvency tests": (i) the balance sheet test; (ii) the equitable insolvency test or cash flow test; and (iii) the capital adequacy test. Quinn further states that "[a] company must pass all three tests to be considered solvent."

15.    Quinn then renders three opinions. First, Quinn opines that "by the September 19, 2014 transaction, the Company overleveraged its balance sheet, effectively diluted its equity capital with debt, and positioned itself with unreasonably small capital to generate profits and cash flows to sustain its operations, to manage the significant risks of the construction industry, to manage general economic downturns, or to provide a reasonable margin for error. Although this could and should have been foreseen at the time, it became inescapably clear no later than June

---

[15] *Id.* p. 3 (App._000194).

[16] A true and correct copy of the Initial Report is attached as **Exhibit 9** (App._000213).

30, 2015. Stated differently, the SPI Transaction rendered the Company insolvent because it left the Company inadaquately (sic) capitalized."

16.     Second Quinn opines that "the Company became insolvent as a result of the SPI Transaction because the Company could no longer pay its debts as they became due."

17.     Finally Quinn opined that "while not conclusive because of the accounting treatment of goodwill, the Company's assets were less than its liabilities at a fair valuation following the SPI Transaction."

### C.     The Supplemental Report

18.     On April 2, 2021, Thompson Street produced the expert report of Gene L. Deetz, (the "**Deetz Report**") in which Mr. Deetz issued opinions regarding the solvency of Stone Panels and identifying several mathematical and methodological errors in Quinn's Initial Report. In response to the Deetz Report, on May 7, 2021, Quinn provided his Supplemental Expert Report (the "**Supplemental Report**").[17]

19.     In the Supplemental Report, Quinn provides four (4) justifications for and defenses of his Initial Report. First, Quinn defends the revenue and EBITDA assumptions used in his Initial Report as reasonable. Specifically, Quinn defends his use of financial projections with zero percent (0%) growth for Stone Panels for the years 2015, 2016, 2017, 2018 and 2019, as well as his use of 10-15% EBITDA margins. Quinn alleges that these financial projections were reasonable because (i) after the September Transaction, Stone Panels replaced its vice-president of operations; (ii) created urgent labor problems; (iii) Stone Panels' management was highly critical of the new vice-president of operations; (iv) Thompson Street "immediately terminated approximately 1/3 of

---

[17] The Supplemental Report is attached hereto as **Exhibit 10** (App._000235).

its thirty (30) skilled employees at its U.S. plant";[18] (v) "[o]ver the next several months, Thompson Street fired or caused to resign an additional 13 or 14 skilled laborers"; and (vi) the replacement workers were inexperienced, inefficient, and incapable of producing quality products.

20.        Second, Quinn admits to tax errors in his Initial Report, but states that the tax errors do not impact his final conclusions about Stone Panels' solvency under the adequacy of capital test.

21.        Third, although Quinn admits that Altman Z scores (used in his initial report to support his conclusion that the Company was insolvent) do not relate to a company's solvency or insolvency, he alleges that because Stone Panels' Altman Z score suggested it was "operating in the distressed zone" "it is reasonable to conclude that the debt would be the proverbial straw that broke the camel's back sending the company into bankruptcy."

22.        Finally, Quinn states that his tax errors do not impact his conclusions regarding Stone Panels' solvency under the cash flow test.

## IV.        Relief Requested

23.        By this Motion to Strike, the Thompson Street Defendants request that this Court enter judgment striking Quinn's testimony as an expert witness.

## V.        Legal Standard

24.        The Supreme Court of the United States held in *Daubert* that the Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. 579, 597 (1993). In its subsequent ruling in *Kumho Tire Company, Ltd. v. Carmichael*, the Supreme Court ruled that "*Daubert's* general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only

---

[18] To be clear, Stone Panels terminated any employees, not Thompson Street. Moreover, it is uncontested that the terminations were due to the employees' lack of legal work status in the United States.

to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized knowledge.'" 526 U.S. 137, 141 (1999). Thus, "Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to ensure that any and all [expert] testimony . . . is not only relevant, but reliable." *Id*. at 147 (citations omitted). Although the trial court has discretion in choosing the manner of determining expert reliability, "[it] is not discretion to abandon the gate-keeping function [and] it is not discretion to perform the function inadequately." *Id*. at 159. (Scalia concurring).

25.       The foundation for admissibility of expert testimony is provided in the Federal Rules of Evidence:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the from of an opinion or otherwise if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliable to the facts of the case.

Fed. R. Evid. 702.

26.       The central question under the Rule is "whether the expert's opinion is sufficiently grounded to be helpful to the [fact finder]." *Unrein v. Timesavers, Inc.*, 394 F.3d 1008, 1012 (8th Cir. 2005). The Court's objective is to ensure that the expert opinion is properly supported and will assist the fact finder "to understand the evidence or determine a fact in issue." *Daubert*, 509 U.S. at 589, 591, 595.

27.       *Daubert* itself holds that Federal Rule of Evidence 702 imposes upon the trial court the obligation, when dealing with expert witnesses, to ensure that expert testimony is "not only relevant, but reliable." *Daubert*, 509 U.S. at 589. Reliable testimony must be based upon a reliable methodology and reliable data; conclusions cannot be based on the expert's *ipse dixit*. *State Auto. Mut. Ins. Co. v. Freehold Mgmt.*, Civil Action No. 3:16-CV-2255-L, 2019 U.S. Dist. LEXIS

55052, at *9 (N.D. Tex. 2019) ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate … the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *Wells Fargo Bank N.A. v. Tex. Grand. Prairie Hotel Realty, L.L.C. (In re Tex. Grand Prairie Hotel Realty, L.L.C.),* 710 F.3d 324, 329 (5th Cir. 2013). "If the witness is relying solely or primarily on experience, then he or she must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. This is because the trial court's gatekeeping function requires more than simply taking the expert's word for it that the claimed basis supports the opinion." *Id.* *11-12.

28.      The party attempting to introduce expert testimony bears the burden of proving reliability. *See Moore v. Ashland Chemical, Inc*., 151 F.3d 269, 276 (5th Cir. 1998) (en banc).

## VI.      **Arguments and Authorities**

29.      Quinn's Initial Report and Supplemental Report are based on unreliable data and unreliable methodologies and, thus, should be excluded.

### A.      **Quinn's Adequate Capital Test and Cash Flow Test are Unreliable because They are based on Quinn's *Ipse Dixit* and Ignore the Actual Data**

30.      Quinn's adequate capital test and cash flow test (the only solvency tests he performed) are based on a "sensitivity analysis" in which he created two five-year financial projections for Stone Panels to determine whether it had sufficient net liquidity and sufficient free cash flow to support Stone Panels' operations. The five-year financial projections Quinn used for his sensitivity analyses assume that for the years 2015 to 2019 Stone Panels would have zero percent (0%) growth in revenue and an EBITDA margin of either ten percent (10%) or fifteen

percent (15%).[19] A reasonable expert *must* consider more than one growth model. It is inconceivable that Quinn purports to have completed his analysis using only a 0% growth model. Furthermore, Quinn's assumption that Stone Panels would have zero growth for five consecutive years is unsupported by **any** data. It ignores **all** data actually relied upon by Thompson Street and **all** data reasonably available to Thompson Street at the time of the transactions. Quinn's scenarios rely **only** on his unsupported conclusions and hindsight bias. As such, Quinn's opinions on solvency must be stricken as unreliable.

31.      An adequacy of capital test must be viewed from the time of the transaction in question and without the benefit of hindsight. *See Williams v. Wu (In re TTC Plaza Ltd. P'ship)*, Nos. 11-38381, 13-03261, 2014 Bankr. LEXIS 1359, at *11 (Bankr. S.D. Tex. 2014) ("The test is whether the unreasonably small capital condition and consequent cash flow problems were reasonably foreseeable when viewed objectively at the time of the transaction at issue."); *Duke Salisbury v. Tex. Commerce Bank, N.A. (In re WCC Holding Corp.),* 171 B.R. 972, 985 (Bankr. N.D. Tex. 1994) ("Evaluation of cash flow projections must focus on information available at the time of the transaction, not on hindsight."). The starting point for such analysis should be the financial projections used at the time of the transfer to determine whether they were reasonable at that time. *Duke Salisbury v. Tex. Commerce Bank, N.A.,* 171 B.R. at 985 ("The sufficiency of WCC's assets must be analyzed by inquiring into the reasonableness of cash flow projections given the circumstances on the date of transfer … The court should principally focus not on whether the projections were correct but on whether they were reasonable and prudent at the time they were made."). "Relevant data to consider includes historical cash flow, gross profit margins, net profits,

---

[19] Quinn's EBITDA margin is similarly lower than those achieved by the Company and projected by the Company, Acclaro, and Transcend.

and working capital. Historical performance is an important, but not the only, indicator of [a debtor's] future ability to generate cash and pay its debts. To a degree, the parties should account for difficulties that are likely to occur and for reasonably potential general economic downturns." *Id.*

<em>i.</em>  <em><u>Quinn's Financial Projections are Unsupported Conjecture</u></em>

32.  Quinn's projections are not based (i) Stone Panels' historic performance; (ii) Stone Panels' projections at the time of the transactions; (iii) Thompson Street's projections for Stone Panels at the time of the transactions; (iv) third party projections at the time of the transactions; or (v) market data at the time of the transactions that might indicate reasonable expectations. Instead, Quinn's projections are unsupported conjecture.

33.  In reaching his conclusions, Quinn ignores **all** projections that were used by or available to Thompson Street at the time of the transactions. Quinn ignored Stone Panels' historical revenue growth, which was 33.9% (2011 to 2012), 42.1% (2012 to 2013), and 5.8% (2013 through the first four months of 2014).[20] Quinn ignored the projections from management provided in the Bigelow Investor Presentation, which estimated 71% growth during the same time period that Quinn estimated zero percent growth (0%).[21] Quinn ignored the market due diligence materials that Thompson Street commissioned in July 2014 from Acclaro.[22] The Acclaro report projected a 15% growth in the market segment for which Stone Panels was "the clear market leader."[23] Quinn also ignored financial projections utilized by Transcend in creating its valuation, which projected

---

[20] *See* ASC 805 Analysis of Stone Panels, Inc. (TCSP0035444) p. 32; *see also Duke Salisbury v. Tex. Commerce Bank, N.A., 171 B.R. at 985* ("The court should principally focus not on whether the projections were correct but on whether they were reasonable and prudent at the time they were made. … Relevant data to consider includes historical cash flow, gross profit margins, net profits, and working capital.").

[21] Bigelow Investment Opportunity & Investor Interview, attached hereto as **<u>Exhibit 11</u>** (App._000251).

[22] *See* Stone Panels Inc. Market Due Diligence, attached hereto as **<u>Exhibit 12</u>** (App._000276).

[23] *Id.* p. 6 (App._000283).

an average of 12.8% revenue growth for the same time period that Quinn estimated zero percent growth (0%).[24] The projections in the Transcend Valuation were provided by Stone Panels' management and were compared to comparable companies to ensure their reasonableness.[25]

34.     Put simply, Quinn ignored **<u>all</u>** information available to Thompson Street at the time of the transactions and invented a scenario in which Thompson Street acquired Stone Panels for $34,000,000, and should have **reasonably** anticipated that the Company would have 0% growth for five consecutive years.

> ii.     *Quinn's Justifications for his Projections are Impermissible Hindsight*

35.     In his initial report, Quinn offers two justifications for ignoring all contemporaneous financial projections for Stone Panels and instead creating scenarios with 0% growth: (i) "one would expect lower revenues during a transitional period given major changes in the Company"; and (ii) the monthly revenue projections were higher than the preceding eighteen (18) months.[26] Neither of these assertions is supportable.

36.     First, Quinn provides no support for his assumption that "one would expect lower revenues during a transitional period given major changes in the Company." Quinn cites to no market data, no published materials, no historic metrics, or any other materials that would support such an assertion. Indeed, Quinn does not even identify any "major changes to the Company" that occurred during either Transaction or that was reasonably contemplated after either Transaction. Thompson Street relied on the Bigelow Investor Presentation, which touted Stone Panels as having

---

[24] *See* ASC 805 Analysis of Stone Panels, Inc. p. 38 (App._000159).
[25] *Id.* (App._000158)
[26] Initial Report p. 8 (App._000221).

an "Excellent Management Team" with "Core executive team committed to execute on next 5-year plan."[27] Thus, Quinn's assertion is not only unsupported, it is belied by the facts.

37.    During his deposition, Quinn admitted that his projection of 0% growth was:

- Not based on any market research
    - Q. Okay. Did you conduct any market research before deciding that a zero-percent growth rate was appropriate? A. No.[28]
- Not based on any projections from Stone Panels
    - Q. Did you see any projections from Stone Panels that indicated Stone Panels expected a zero-percent growth rate from 2015 to 2019? A. No.[29]
- Not based on any communications from Stone Panels
    - Q. Did you review any contemporaneous Stone Panels' communications, emails, letters, et cetera, indicating that the company expected zero-percent growth from 2015 to 2019? A. No.[30]
- Not based on projections from any third-party
    - Q. Did you review any projections from any third party projecting a zero-percent growth rate for SPI in the time frame of 2015 to 2019? A. No.[31]
- Not based on interviews with Stone Panels employees
    - Q. So did you interview -- well, I -- I know you didn't. You didn't interview any SPI employees to reach the conclusion that those -- that the projections for July and August were unreasonably high, did you? A. I did not.[32]

38.    During his deposition, the only support Quinn could offer for his opinion that "one would expect lower revenues during a transitional period" is that leveraged buyouts are "known to be hostile."[33] Quinn had no support for his conclusion that leveraged buyouts are known to be hostile or that they would completely negate any growth for five years. *See* Quinn Depo. 60:23-

---

[27] Bigelow Investment Opportunity & Investor Interview at (App._000244); *see also id.* at TCSP0010958 ("Best in Class Leadership Team") (App._000249).

[28] Deposition of Christopher Quinn 5/18/2021 (the "**Quinn Depo.**"), excerpts of which are attached hereto as **Exhibit 13** at 67:19-22 (App._000355).

[29] *Id.* 67:23-68:1 (App._000355-356).

[30] *Id.* 68:2-6 (App._000356).

[31] *Id.* 68:7-10 (App._000356).

[32] *Id.* 75:7-11 (App._000359).

[33] *Id.* 60:18-61:2 (App._000352).

61:2, 61:16-62:6 ("leveraged buyout is -- is known to be -- known to be hostile. It's – it's not viewed well. That's – so it's a risk that's not going to work out, and that is reasonably foreseeable. There's a chance of that occurring … Q. Why is an LBO hostile? A. Because it's – it's -- the – it's usually a -- at the -- a -- a targeted company or that the -- the buyout takes -- takes the new ownership position that maybe the target company doesn't want. It's – it's in – it's in various literature. It was, you know, big in the '80s of plenty of LBOs that -- that turned into bankruptcies. I mean, there's literature out there that indicates that it's generally thought of as a hostile tactic. Q. What literature? A. All over the place. Q. That's hard to find in the library. 'All over the place' is hard to find. What literature are you talking about? A. I don't have titles right now.") (App._000352-354).

39.     Moreover, Quinn could not tie his conclusory assertion that leveraged buyouts are hostile to the Transactions at issue in this lawsuit. Quinn Depo. 72:20-73:10, 83:18-23 ("Q. Did -- did -- did Stone Panels put itself up for sale? Yes or no? A. I believe so, yes. … Q. So this was not a predatory transaction? A. I never said it was. I said it's often viewed. I don't know if this was a predatory transaction or not. They voluntarily put themselves up for sale; they found -- they found a buyer. They ran a process. … Q. Do you view this transaction, the -- the acquisition of the equity of Stone Panels as a hostile transaction? A. I -- I do not. Q. Do you see it as a predatory transaction? A. I -- I have seen no evidence that it is.") (App._000357-360). Thus, even assuming that leveraged buyouts are "known to be hostile," Quinn cannot say that the acquisition of Stone Panels was hostile. Thus, Quinn's opinion that "one would expect lower revenues during a transitional period given major changes in the Company" is completely speculative and renders his analysis unreliable.

40.      Second, Quinn provides no basis for his assertion that in five years Stone Panels'
revenue could not grow beyond the revenue received in the eighteen (18) months before the
Transactions. In fact, Quinn's assumption that revenue could not grow after the Transactions
ignores Stone Panels' actual financial history, which showed historical revenue growth before the
Transactions of 33.9% (2011 to 2012), 42.1% (2012 to 2013), and 5.8% (2013 through the first
four months of 2014).[34] It also ignores the projections provided contemporaneously with the
Transactions, including those provided by Bigelow, Transcend, Stone Panels' management, and
Acclaro.

41.      As with his conclusion about the "hostile" acquisition of Stone Panels, Quinn
ignores all projections that were used by or available to Thompson Street at the time of the
transactions. Quinn's conclusion that Stone Panels' future revenue could not surpass its prior
revenue is simply based on his own intuition in hindsight, not evidence or the type of data upon
which a reasonable expert could rely.

iii.      *Quinn's Supplemental Report uses Hindsight Bias to Justify his
Projections, but Fails to Cure the Fatal Defects in the Initial Report*

42.      In his Supplemental Report, Quinn tries to bolster the unsubstantiated assumptions
in his Initial Report by asserting that (i) after the September Transaction, Stone Panels replaced its
vice-president of operations; (ii) Thompson Street created urgent labor problems; (iii) Stone
Panels management was highly critical of the new vice-president of operations; (iv) Thompson
Street "immediately terminated approximately 1/3 of its thirty (30) skilled employees at its U.S.
plant"; (v) "[o]ver the next several months, Thompson Street fired or caused to resign an additional
13 or 14 skilled laborers"; and (vi) the replacement workers were inexperienced, inefficient, and
incapable of producing quality products. These assumptions are based on the Declarations of

---

[34] Bigelow Investment Opportunity & Investor Interview at (App._000269).

Dewey Winker and Timothy Friedel.[35] Quinn did not speak with Mr. Winker or Friedel or review any documents that would support these conclusory assertions. More importantly, Quinn does not tie any of these assertions to his analysis: Quinn does not indicate if any of these alleged events occurred before the Transactions or were reasonably anticipated at the time of the Transactions, whether or how any of these alleged events would impact Stone Panels' financial performance, and whether or how any of these alleged events would prevent Stone Panels from experiencing **any** growth for a period of five years.

43.     For example, Quinn cites to the replacement of Stone Panels' vice president of operations as a reason to project 0% growth for five years. However, Stone Panels did not terminate the vice president of operations until after the Transactions, and Quinn cites no evidence that the replacement would negatively impact Stone Panels' performance.[36] To the contrary, the president of Stone Panels, Tim Friedel, supported the termination and expected the replacement vice president of operations to improve the Company's performance.[37] Moreover, the alleged opposition to and conflict with the replacement vice president of operations could not have been known by Thompson Street until at least January 2015, when the replacement, Spencer Malcolm, was hired.[38] Thus, Quinn's analysis relies on risks that were **_not_** "reasonably foreseeable when viewed objectively at the time of the transaction at issue." *See Williams v. Wu, 2014 Bankr.* LEXIS

---

[35] Supplemental Report nn. 2-7 (App._000236).

[36] *See* Deposition of Timothy Friedel at 41:9-42:8, excerpts of which are attached hereto as **Exhibit 14** (App._000369).

[37] *Id.* at 42:14-17, 43:1-9 ("Q. Okay. Did you oppose firing Mr. Taylor? A. No. Q. Did you support it? A. Yes … A. There was a process. And we were replacing Thomas Taylor. Thomas Taylor, like I said, was a B plus player. He provided, you know, many goods things, but there were areas where he had shortcomings. We were hoping, you know -- and it was my hope and intent that we would upgrade the hiring by retaining someone who was an A plus player, someone that could lead us in the next direction, someone that could help support the operations to get it to the level it needed to be.") (App._000369).

[38] *See* Deposition of Dewey Winker at 20:15-17, excerpts of which are attached hereto as **Exhibit 15** (App._000373).

1359, at *11; *Duke Salisbury v. Tex. Commerce Bank, N.A.*, 171 B.R. 985. Instead, his analysis is based on events that were unexpected at the time of and did not occur until after the Transactions.

44. Likewise, Quinn fails to demonstrate that Thompson Street should have reasonably foreseen various labor problems at the time of the Transactions or indicate why such problems would completely stymy growth for five years. Quinn alleges that Stone Panels "immediately" terminated a third of its skilled employees, but indicates neither whether those terminations were anticipated before the Transactions nor the expected impact those terminations would have on Stone Panels' performance. Moreover, Quinn's own report indicates that the other labor problems arose after the transactions. Supplemental Report p. 2 ("Over the next **several months**, Thompson Street fired or caused to resign an additional 13 or 14 skilled laborers" and the **replacement** workers were inexperienced, inefficient, and incapable of producing quality products) (emphasis added).

45. Thus, Quinn's belated support for projecting 0% growth for five years is based on hindsight and not on information available to Thompson Street at the time of the Transactions.

**B. Quinn's Adequate Capital Test and Cash Flow Test are Unreliable because They are based on Unreliable Methodologies**

46. In addition to using unreliable data, Quinn's expert opinions must be stricken because they are based on unreliable methodologies.

     *i.*    *Quinn Cherry Picks a Five Year Timeline and Assumes that Stone Panels cannot refinance its Debt*

47. In his adequate capital test and cash flow test, Quinn examines Stone Panels' solvency at the end of five years.[39] Quinn did not pick five years because of any relevant caselaw

---

[39] Initial Report pp. 6-8 (App._000218-221).

or literature.[40] Rather, Quinn used a five-year timeline because the PrivateBank Note matured in 2019.[41]

48.    Even then, under Quinn scenario 2 (using 0% growth and a 15% EBITDA margin), Stone Panels is solvent under both the adequacy of capital test and the cash flow test until 2019, when the PrivateBank Note matures.[42] Under Quinn scenario 2, Stone Panels is insolvent in 2019 based only on the assumption that Stone Panels would not be able to refinance the PrivateBank Note. Thus, Quinn's opinion that Stone Panels was insolvent under the adequacy of capital test and the cash flow test hinges on the assumption that in 2014 Thompson Street should have reasonably anticipated that Stone Panels could not refinance the PrivateBank Note in 2019.

49.    In his Initial Report, Quinn provides no basis for his assumption that the PrivateBank Note could not be refinanced in 2019. In his Supplemental Report, Quinn opines that "the debt to captital (sic) ratios would be 56% and 44% respectively" and at "those ratios, it is highly unlikely that the Company's debt could be refinanced in part or in whole, resulting in insolvency." Quinn offers no support for his conclusory assertion that the Company could not refinance all or part of its debt based on a debt to capital ratio of 56% to 44%. Indeed, in his deposition, Quinn admits that he _did not look at any market data or speak to any bankers_ to

---

[40] Quinn Depo. 111:5-16 ("Q. Yeah. Other than it's just your opinion, do you have anything to base your five-year horizon on? A. Again, I think it's appropriate that you -- you extend it to look through the time that you have to repay the debt to see if you have enough cash flow and enough -- and adequate capital to cover -- cover that debt service. Q. My specific question is -- my specific question is, do you have any literature that you're relying upon? Do you have any case law that you're relying upon? A. I -- I didn't go to case law for -- to rely on a -- a five-year period.") (App._000365). In his Supplemental Report, Quinn support a five-year timeline for solvency by citing to _Unreasonably Small Capital_, January 28, 2014, A. Saavedra. The publication is a blog post from an associate at Weil Gotshal and Manges and cites no case law or authorities. _See_ https://restructuring.weil.com/avoidance-actions/unreasonably-small-capital/.

[41] _Id.; compare to_ Expert Report of Gene Deetz at p. 34 (citing to _Beyond Moody: a Re-Examination of Unreasonably Small Capital,_ Hastings Law Journal Volume 57 Issue 4, Article 5 (providing that an adequacy of capital analysis should be a period of quarter up to two to three years)), a true and correct copy of the Deetz Report is attached as **Exhibit 16** (App._000411).

[42] Initial Report pp. 6, 8 (App._000218-221).

determine whether Stone Panels could have reasonably refinanced debt with a 44-56% debt to capital ratio. Quinn Depo. 75:6-21 ("Q. Right. Okay. Did you look at any market data on the availability of financing for the refinance of companies? A. I did not. Q. Did you talk to any potential lenders … Did you talk to any lenders to determine whether or not they would have been willing to refinance this debt? A. Back in 20 -- back at the time it was -- the payment was due? Q. Yes. A. No.").

50.　　　Thus, Quinn's opinion of insolvency under the adequacy of capital test and the cash flow test is based on the unsupported conclusion that the PrivateBank Note could not have been refinanced. His opinion is, therefore, unreliable.

　　　　　　　　ii.　　　*Quinn Admits that he Erred in his Original Calculations of Adequate Capital and Cash Flow and that he Erred again in his Supplemental Calculations*

51.　　　In both his Initial Report and his Supplemental Report, Quinn incorporated errors in his calculations of adequate capital and cash flows that render both opinions unreliable.

52.　　　In his Initial Report, Quinn created projections of Stone Panels' net liquidity (to determine solvency under the adequacy of capital test) and levered free cash flow (to determine solvency under the cash flow test). The Deetz Report identified a significant error in in tax treatment under Quinn's projections.[43] The total tax error resulted in Quinn undercounting cash flow from 2015 to 2019 by $5,260,000 in scenario 1 and by $2,860,000 in scenario 2.

53.　　　In his Supplemental Report, Quinn admits to the tax errors, but alleges that they do not change his conclusions about Stone Panels' solvency.[44] However, the corrected tax status significantly changes the outlook of Quinn's projections. In Quinn's Initial Report, he determined under scenario 1 that Stone Panels became insolvent under the adequate capital test by the end of

---

[43] Deetz Report pp. 33-34 (App._000410-411).
[44] Supplemental Report p. 2 (App._000236).

2018 (it was only insolvent under scenario 2 based on the inability to refinance the PrivateBank Note). With the tax error corrected, Quinn's projections show that Stone Panels was solvent under scenario 1 of the adequate capital test until 2019, when the PrivateBank Note matured.[45] Thus, with the tax error corrected, three of the four scenarios Quinn created show that Stone Panels was operationally solvent and only became insolvent based on the unsupported assumption that it would not be able to refinance the PrivateBank Note.

54.     Additionally, Quinn admits that the "corrected" calculations in his Supplemental Report are also flawed because after adding revenue to fix the tax error, Quinn added additional and unjustified costs.[46] Specifically, in his Supplemental Report Quinn added "Capital Expenditures – growth" (line 25) and "Working Capital Requirement, Excluding Cash and Debt" (line 29).[47] Neither of these expenses appears in his Initial Report and both are inappropriate because they are costs associated with revenue growth and Quinn projects 0% growth. During his deposition, Quinn admitted that these expenses were inappropriate for his 0% growth scenarios. *See* Quinn Depo 104:4-12, 108:4-8 ("Q. Right. And so what you did is you added two additional expense lines that didn't appear previously, right? And that first one of those is line 25: Capital expenditures - growth, right? A. Right. Q. And so you added in your 2015 $325,000 of capital expenditures for growth that were not previously in your projection, right? A. I believe that's right, yes … Q. And you think that's a reasonable projection? A. No. Like I said, that's – that's – that's probably a -- an incorrect calculation trying to replicate what Mr. Deetz did that -- based on -- based on a -- a different assumption that I took …Q. Line 29 is another expense that was not in

---

[45] Supplemental Report p. 3 (App._000237).

[46] *See* Analysis Supporting Supplemental Expert Report of C. Quinn, attached hereto as **Exhibit 17** (lines 25 and 29) (App._000441).

[47] *Id.*

your first report. Why was this added? … A. It's just a sale [cell], so I'm not sure what it's linked to. I -- I don't know the source of that sitting here at the moment.") (App._000363-364).

55.     Thus, in addition to his unreliable data, Quinn's report is based on unreliable calculations and must be stricken.

### iii.    *Quinn Justifies his Conclusions based on the Irrelevant Altman Z Score*

56.     Because Quinn's data and methodology cannot stand on their own, he seeks to bolster them by citing to a metric called the Altman Z score. In his Initial Report, Quinn describes that Altman Z score as "a well-known and regularly used formula to predict the likelihood that a business will go bankrupt in the next two years."[48] The Altman Z score provides a company with a value and based on that value categorizes it as in the "safe zone," "grey zone," or the "distressed zone."[49] Quinn calculated Stone Panels' Altman Z score and determined that it was operating in the "distressed zone" both before and after the Transactions.[50] Quinn also compared Stone Panels' Altman Z score to five "companies comparable to [Stone Panels]" that he alleges were "selected based on their inclusion as comparables" in the Transcend Valuation.

57.     Quinn's use of the Altman Z score is unreliable and should be stricken. As Quinn admits, the Altman Z score is not a measure of solvency. Quinn Depo. 93:17-19 ("Q. Okay. And to be clear, the Altman Z-score is not a measure of solvency, correct? A. Agree.") (App._000361). On that basis alone, it should be stricken. However, there are other problems with Quinn's use of the Altman Z score.

---

[48] Initial Report p. 7, n. 3 (App._000219).
[49] *Id.*
[50] Initial Report p. 7 (App._000219).

58.       Quinn made a number of calculation errors in determining both Stone Panels' Altman Z score and the Altman Z scores of the "comparable" companies.[51] Moreover, Quinn cherry-picked his Altman Z data. The Transcend Valuation included eight (8) companies that were determined to be comparable to Stone Panels.[52] Rather than comparing Stone Panels' Altman Z score to all eight of the comparable companies, he picked the five (5) companies with the best Altman Z scores to use in his report.

59.       Further, as Quinn admits, the Transactions did not move Stone Panels' Altman Z score from either the "safe zone" or "grey zone" to the "distressed zone."[53] According to Quinn, Stone Panels was already in the "distressed zone" before July 2014 and, thus, it provides no insight into whether the Transactions rendered Stone Panels more or less likely to file for bankruptcy.[54] Put simply, the score is irrelevant to determining whether Stone Panels was rendered insolvent or undercapitalized by the Transactions.

60.       In an attempt to save his Altman Z analysis, Quinn's Supplemental Report couches his analysis. According to the Supplemental Report, the purpose of the Altman Z analysis is not to determine whether the Transactions rendered the Company insolvent, but to make it "reasonable to conclude that the debt would be the proverbial 'straw that broke the camel's back.'"[55] As with his other opinions, Quinn cannot quantify the impact of the Altman Z score on Stone Panels'

---

[51] Quinn Depo. 94:10-12 ("Q. Yeah. Are you -- are you aware of any errors that Mr. Deetz pointed out in your calculation of the Altman Z-score? … Then it looks like 88, he does point out an error. And I would say that if -- if the footnote is correct, that accounts payable was used versus total assets, that that would be correct because one of the -- one of the five ratios is sales to total assets. He's got another footnote. Hold on. Okay. And I would agree with Footnote 95. If -- if the totals don't equal the total assets, then that would be -- then that would be a calculation -- I mean, a formula error.") (App._000362).

[52] Transcend Valuation pp. 33-36 (App._000153-155).

[53] Supplemental Report pp. 5-6 (App._000239-240).

[54] *Id.*

[55] *Id.*

solvency and he is forced to rely on his own assumptions and intuition. Because Quinn's Altman Z analysis is not reliable and is irrelevant to the issue of solvency, it should be excluded.

### C. Quinn's Balance Sheet Opinion is Unsupported and Unreliable.

61.     Quinn's "opinions" on the balance sheet test – to the extent they can be called opinions – should be stricken as unfounded and unreliable. In his Initial Report, Quinn states that there are "three well recognized solvency tests," including the balance sheet test.[56] Quinn then opines that under each test, the Company was insolvent as a result of the July Transaction and September Transaction.[57] Quinn's opinion on the balance sheet solvency test is that "while not conclusive because of the accounting treatment of goodwill, the Company's assets were less than its liabilities at a fair valuation following the SPI Transaction."

62.     Despite proffering a "not conclusive" opinion on balance sheet solvency, Quinn admits during his deposition that he did not even conduct a balance sheet solvency test. *See* Quinn Depo. 23:4-6 ("Q. Okay. Did you independently do a balance sheet solvency test? A. I did not.") (App._000348). Indeed, in his Initial Report Quinn admits that he cannot "refute" the value of Stone Panels' assets – which is necessary to conduct a balance sheet analysis - "[d]ue to time limitations and a lack of relevant information."[58]

63.     However, despite admitting in his deposition and his Initial Report that he did not value Stone Panels' assets to conduct a balance sheet solvency test, Quinn provides an unsupported opinion on Stone Panels' balance sheet. Quinn admits that after the July Transaction the Company reported equity of $17,900,000 and after the September Transaction the Company reported equity

---

[56] Initial Report p. 1 (App._000213).
[57] *Id.* p. 2-3 (App._000214-215).
[58] Initial Report p. 9 (App._000221).

of $19,600,000, but alleges that such reports were "inflated."[59] Specifically, Quinn opines that the equity is inflated because "goodwill is significantly overstated." However, Quinn's Initial Report does not provide even a cursory explanation for his reasoning. His only opinion is that "if the intangible assets are not factored in, the Company is clearly insolvent under the balance sheet test."[60] Quinn, however, provides no explanation for excluding intangible assets from a balance sheet test.

64.     Similarly, Quinn's Supplemental Report does not provide any explanation as to why he believes that Stone Panels' goodwill was "inflated" or why intangible assets would be excluded from a balance sheet analysis.

65.     Only in his deposition does Quinn provide any reasoning for his purported opinions on the balance sheet test. Quinn's only explanation is that intangible assets cannot be sold in a forced liquidation. Quinn Depo. 31:24-32:18 ("And so in my experience over the years and sitting in -- in bankruptcy cases, solvency always arises and you have to look at what you can monetize those assets for and they're not the -- by any means the same value that are portrayed on the books and records and audited financials of -- of the companies. So in order to perform a -- a true balance sheet test, you have to recast those asset values to what they can be monetized for and -- and sold for to cover the liabilities which typically don't come much off of face value, if at all Q. (BY MR. AURZADA) What is your basis for making that statement? A. My years of experience in -- in performing a plan feasibility test, looking at what a -- at what a Chapter 11 would yield versus a Chapter 7, knowing what, you know, distressed companies sell for, what -- what the market will

---

[59] *Id.*; Quinn Depo. 24:17-21 ("A. No, I think what I said is I had all the8 relevant information I needed to present this report as is. I only -- only have to prove failure of one test. I've -- I've -- I've shown failure of two tests. I didn't need to fully go through the third test.").

[60] *Id.*

purchase, you know, hard assets for versus I'll call soft assets that are, you know, like intangibles and goodwill,") (App._000349-350).

66.     Quinn provides no basis for using a chapter 7 liquidation analysis to determine balance sheet solvency[61] and it is incorrect as a matter of law. See*, e.g. Williams v. Wu (In re TTC Plaza Ltd. P'ship),* Nos. 11-38381, 13-03261, 2014 Bankr. LEXIS 1359, at *15 (Bankr. S.D. Tex. 2014) ("The insolvency evaluation through the balance sheet analysis should include consideration of the Debtor as a 'going concern' and asset values associated with such a classification."). For these reasons, Quinn's purported balance sheet opinions should be excluded as a matter of law.

## **PRAYER**

In light of the foregoing, the Thompson Street Defendants request that this Court grant this *Motion to Strike*, enter an order striking any testimony from Christopher Quinn, and award any such other and further relief, at law or in equity, to which the Thompson Street Defendants may show themselves to be justly entitled.

---

[61] Quinn Depo. 33:5-21 ("Q. Everything you've told me there, Mr. Quinn, is anecdotal. What -- what literature would you point to for that fact? … A. Well, as I started, I said in my -- in my years of experience in -- in bankruptcy cases and distressed companies, I'm sure there is literature to point to but in the practical, real world of -- of, you know, doing this for a living and look at what you can, you know, turn assets for to cover liabilities as it relates to, you know, solvency if you -- if you have enough assets to cover liabilities is based on my experience, but I'm sure there is literature available. Q. Do you -- sitting here today do you know what that literature is? A. Not sitting here today. I don't have a book title for you.") (App._000351).

Dated:  June 7, 2021.

Respectfully submitted,

By: */s/ Keith M. Aurzada*
     Keith M. Aurzada (SBN 24009880)
     Michael Cooley (SBN 24034388)
     Bradley J. Purcell (SBN 24063965)
     Lindsey L. Robin (SBN 24091422)
     **REED SMITH LLP**
     2850 N. Harwood Street, Suite 1500
     Dallas, TX  75201
     T:  469.680.4200
     F:  469.680.4299
     kaurzada@reedsmith.com
     mpcooley@reedsmith.com
     bpurcell@reedsmith.com
     lrobin@reedsmith.com

*Counsel to Thompson Street Capital Partners, Thompson Street Capital Partners L.L.C., and Thompson Street Capital Partners III, L.P.*

## CERTIFICATE OF SERVICE

I hereby certify that on **June 7, 2021**, a true and correct copy of the above foregoing document was served via the Court's Electronic Case Filing (ECF) system on all parties registered to receive electronic service in this matter, including counsel for the Plaintiff.

*/s/  Keith M. Aurzada*
Keith M. Aurzada

## CERTIFICATE OF CONFERENCE

I hereby certify that on **June 7, 2021**, counsel for Thompson Street conferred with counsel for the Trustee regarding the Motion. The Trustee is opposed to the above-requested relief.

*/s/  Keith M. Aurzada*
Keith M. Aurzada